The last case to be argued this morning is, if I'm pronouncing it correctly, in Ray Wieneke et al., 2011, 1250. Mr. Springer. Thank you, Honors. May it please the Court. Paul Springer. Thank you, Your Honor. I would like to begin by saying that this is a case in which the legal party of interest, SonicWall, Inc., brings this appeal from the Board of Patent and Appeals of the United States Patent and Trademark Office with respect to an erroneous interpretation of the judge reference and the subsequent erroneous application of that reference to the SonicWall applications before us today. Now, there are two specific claim limitations that SonicWall would like to address in this context. Specifically, a trusted user on an intranet, and then further, receiving an indicator from that trusted user concerning whether a name should remain on a white list. And these two claim elements appear throughout all the independent claims of the application in some contextually variant form. Now, before jumping into the specifics of the interpretation of judge and the claims at issue, perhaps a little background on the underlying technology, which concerns whitelisting. Now, whitelisting is a methodology that's used to prevent influx of spam into an email network. And in its simplest form, whitelisting involves me putting a name on a list such that when someone sends me an email, I'm able to receive it. So, for example, Judge Lori, I put your name on my whitelist. You subsequently send me an email. I receive it. Whereas, Judge O'Malley, if your name is not on my whitelist, you can try to send me an email. That email message is either quarantined or I never receive it at all. Now, there's typically two ways of creating a whitelist. One is manually entering names onto that list, simply typing them in and the list is populated. A more convenient way of doing so, however, involves a user sending a message to a recipient and the recipient's name automatically being added to the list. So, for example, Judge Raina, if I was to send you a message, as that message goes on the outbound, it would be added to the whitelist under the theory that at some point you're going to reply to me. And since I would like to receive your reply, it's added to the whitelist such that I can receive it. Now, herein lies the problem and where the SonicWall solution eventually comes into play, is that in a perfect world, people on an email network environment, for example, at work, only use their email for work. They talk to vendors, they talk to other people in the company. We all know that's not what happens. People talk to their friends, they talk to their family, they start signing up for newsletters, Lyft serves, Groupon, Fantasy Football. And the next thing you know, there's all these people on the whitelist that can start spamming the company and start overwhelming the email network. So, what SonicWall has done is to solve this problem by only allowing trusted users to add names to the whitelist. And this comes into the context of the first claim limitation, a trusted user on an intranet. Now, a trusted user is more than just a simple user, a simple, any user on the network. A trusted user, as the name suggests, is one that has some semblance of trust. Now, the specification of the Wynikey application talks about in one instance, for example, a trusted user could be people that belong to a certain group or a certain division. And this is found in the appendix at page seventy-seven. So, a perfect example would be the IT department or the network administration department. They're obviously gonna be very protective of the network because that's their job. So, they can be considered a trusted user that's only gonna allow email traffic or adding names to the whitelist that should be on the list. Another example that's found on page eighty-two of the appendix is something that's determined by policy. So, for example, I can say, well, only the heads of each department are gonna be considered trusted users. Or only certain people that have a certain security clearance can be trusted users. So, I can use a policy to determine who goes on that whitelist. Mr. Springer, where do the patent office fall short on the anticipation projection? So, the first example of where they fell short on anticipation is with respect to the trusted user. So, I've identified what that trusted user is. It's a user that can be trusted. Now, the patent office refers to the judge reference as evidencing that trusted user. But that trusted user simply is not in judge. The heart of the patent office's argument with respect to the trusted user argument can be found on page forty-two of the appendix, which is column six, line forty-nine through fifty-one. And there is a singular reference at line forty-nine through fifty-one concerning the system of the present invention operates between a set of trusted peers. Now, at first glance, that sounds, trusted peers, sounds a lot like a trusted user. But if you read the rest of the context of that area or that part of the specification of the judge reference, there's no discussion about what a trusted peer is. And in fact, if you read further in the judge reference over to column seven, specifically around line nineteen, it talks about that trusted peer is not a user on the internet. So, for example, it's a user-based messaging notification system that is operative between messaging security systems. So, we're not talking about users in judge with respect to that trusted peer. We're talking about different email security systems along the internet, not even the intranet. But in addition to that, they're not actual users. It's the systems as a whole. So, there is no trusted user in the judge reference, just security systems that are trying to maintain trust in a network environment. Now, the patent office makes numerous references to the judge patent to try to support its interpretation of this trusted peer. The first, obviously, being column six, line forty-nine. Another example is found in the red brief on page seven. They talk about judge at column three, line fifty-three. But that portion of the judge reference really says nothing about a trusted peer. In fact, it's just talking about a network. It gives substantial deference to the patent office on what a reference discloses. I agree. And the standard for upholding, but there is, at the same time, the standard is, is there substantial evidence to uphold the findings of the patent office? And Sonic Wallace's argument is there is no evidence to uphold that finding. Because in each of these instances, there is no reference to a trusted peer. It's a clearly erroneous misinterpretation of what the judge reference teaches, or more specifically, what the judge reference does not teach. So, for example, at column three, there's no real discussion about a trusted peer. It's talking about a network in general. And actually, if you read further from the patent office's reference at column three over into column four at line seven, they actually talk about that network having a number of security risks. That does not sound like a set of trusted peers to me if they're talking about the security risks that exist in that network. Can you move on to the receiving an indicator issue? Sure. So that is, in fact, in part, reliant upon the trusted user. And what they talk about in judge is, so backing up what the claim covers is, you know, I have my whitelist now. I've got ten people on that whitelist. But over time, certain people might start abusing their ability to send me email. Or, you know, I love getting email from my mom, but I can only take, you know, so many forwarded jokes that, you know, sometimes I have to update that list. And judge does talk about updating it. But what judge does is a machine only, a computer network only update. So, for example, it looks at metrics such as how many times has an email been sent to a person? How many times has an email been received from a person? How long have they been on the list? Things of that nature where a machine makes a purely binary determination. All based on statistics and probability. Correct. Well, I wouldn't necessarily say probability. It's more statistically driven. But probability could theoretically come into that. What's the indicator in the claim? So the indicator in the claim comes from the trusted user. And this is the distinction where the judge is a pure machine learning or a pure network implemented solution. The invention here allows the user to interact. And I can use my personal knowledge, my personal ability to observe context and say, hey, this guy sent me an email. Probably not appropriate, but it's a one time thing. So I'm not gonna boot him off the white list. Or if I see a trend of, you know, hey, this guy is, you know, he was sending me a legitimate email at first. But I'm starting to see this trend where he's sending me more and more and more garbage. I'm gonna kick him off the white list. So it relies upon the ability of a trusted user to provide an indication of he needs to stay or this guy needs to go. And that's something that a machine implemented solution cannot necessarily do. And again, it's not only the user providing that indication, an affirmative instruction from the user, it's that trusted user on the intranet that's providing that indication with respect to updating and maintaining the white list. Sounds like kind of an awkward system though. I mean, your white list is simply based on whether I decide to plug into it and tell you to keep somebody on or take somebody off? It's not necessarily awkward. Whether or not it's effective is a different issue. But it is making it convenient where the email does go out and a person gets added to the list, but it only gets added to the list if the person sending the email is that trusted user to begin with. So, I've reduced my population of people that can add people to the white list to begin with to a small community that would theoretically have the best interest of the company in mind and are not gonna necessarily be using the email network for their own personal business. But at the same time, realizing that just because someone gets on the white list once does not necessarily mean that they need to be on that white list forever so that I or other people that are connected to that white list can say, you know, hey, this guy's been abusing his privileges. He's been sending a lot of spam. We're gonna remove him and kick him off. He might get added on back later, but if I need to remove him for something going on in the interim, I can do that. And that might actually be very effective. For example, think of a situation where somebody's on a white list, a recipient outside the program, and just starts sending, you know, boatloads of spam. I need to kick him off temporarily. You know, in a traditional system, it's like, hey, he's on the white list, he can send you all the spam you want, but I can take him off temporarily. And then once he calls me up and says, hey, sorry, we had an email problem, I can be like, oh, no problem, we'll add you back on the white list. And as a trusted user, I can then interact with the system and reintroduce him to the white list community. So it's in that context with respect to those two claim limitations that SonicWall contends that the Patent Office engaged in an erroneous interpretation of the judge reference, and then an erroneous application of that reference to the SonicWall application, as there is no trusted user on the intranet, nor is there any indication from a trusted user with respect to maintaining the white list. There's no further questions. We will save the rest of your time, Mr. Springer. Mr. Piccolo. Thank you. Thank you, Your Honors. May it please the Court. Judge discloses trusted users. Judge, as was referenced in the panel's opening, expressly states that the system of the present invention, that's the invention in Judge, this is column 6 on page 42 of the record, the system of the present invention operates between a set of trusted peers. That's very good evidence that there's trust involved with these peers on the local network of Judge, respectfully inviting the Court's attention to pages 24 and 25 of the record, where Judge discloses his figures. There are, before the firewall going out to the intranet, the firewall is drawing item 140. There are local clients, which we referred to in our brief, that these local clients... Page 24, though, is discussing a prior art. Is it not? It's not Judge. Well, it is prior art that came before Judge, which is still disclosed in Judge, and is prior art figure 2, Your Honor, on the next page, which I was going to get to. Is Judge's disclosure and figure 2 there, right in the middle, before, again, the firewall, before going out to an intranet, the firewall is item 140. Before then are all these local clients that are in a secured intranet, and they are local clients, and again, column 6... But there's no differentiation among those local clients in the Judge reference. In other words, everybody that's in that local network sends out the emails and there's no notion that some are more trusted than others, correct? Correct, Your Honor. They're all trusted the same as applicants' claim and specification keep the word trusted as just a generic, as just general. For example, applicants' own specification says that, and I am at page 73 of the record, which is page 6 of applicants' specification, three lines from the bottom. Applicant, in his disclosure, says that trusted users are ones the system aims to protect from spam. So, if you are the subject of being protected from spam, you're trusted, and that's as close as applicant gets to defining trusted. Well, right in the Judge reference, on page 41 of the record, which is column 4 of Judge, and we discuss in our brief, there's a passage about, and Judge is very clear, that all the people on the inside are being protected from spam. Judge in column 4, beginning about line 45, talks about spam as being not desired. So, all the clients on the inside of the firewall in Judge are trusted to the same extent that Wyniecki discloses what the word means. It's very generally used in Claim 1, and only, again, generally as protecting from spam used in the specification. So, there is definitely a one-to-one correspondence for trusted in applicant's disclosure and trusted in the earlier Judge expansive reference that deals with a lot of technology. The trusted, there's at least substantial evidence that the trusted has a one-to-one correspondence, and we submit that there's more than substantial evidence to show that the Board was correct in that finding, that trusted is in Judge to the extent it's in the specifications. All right, what about the receiving an indicator? Yes, Your Honor. As the Board noted, Judge teaches a lot about whitelisting, and Judge on column 24 talks about building the whitelist and maintaining it and then using it, and in these three significant columns, as the Board described them, there are tracking over time, where you keep track of entries on the list and do you want to keep that entry on the list. You refer on page 19 of the red brief, you refer to column 24, and you start us down at line 57? Yes, Your Honor. As we get to about, this is maintaining, this is spot on. Show me where the indicator is. Yes, Your Honor. Line 64 in column 24 of Judge talks about an accounting, keeping count of which here we go, internal users, internal users, the trusted ones, report on an outbound address, and then what happens? You can clean up the list in real time. So what we have going on here is the reporting on addresses in real time to clean up the list, and this is in significant column 24. But the reporting in Judge is simply the sending of it, correct? No, Your Honor. Judge refers to other types of outbound messages as being sent as outgoing messages. This reporting in real time, that's a key here, that what you have going on is a list cleanup in real time, and also at the top of page, column 26 of Judge is a tracking of the addresses over time. That you are looking at a snapshot in time, and you may or may not keep someone on a whitelist. This invention is pretty straightforward. That what you have... What you're saying is that the indicator in Judge is simply the sending of messages, is that right? That's one part of Judge, and Judge also does, at the bottom of column 24, in real time to clean up the list. So the reporting has to be happening contemporaneously with what's going on, or else the in real time and the list cleanup concepts disclosed there to a person skilled in this art, and people who are very skilled in this art would read this and say, yes, you clean up a list in real time, and there's reporting by the internal users. You have at least substantial evidence that meets this broad claim limitation. That one sentence is the entirety of your argument that this reads on Judge? No, Your Honor. That and, that is some substantial evidence, yes, and then at the top of column 26 there is a tracking of addresses over time, and that tracking is done internal to the system, and all we have here is that the list has outside emailers who can email in, and the list is being made this is Claim 1, the list is being made from outgoing email and changes with email activity and internal determinations. That's all that's in Claim 1, and as the agency noted, Judge, which is a very big reference, has three full, four columns dedicated to whitelisting that has all the features of this very broad claim. The claim just talks about a determination, an indicator, and what you have with tracking addresses over time is indicators going back and forth, and that's all you need is you need an indicator from within the system to get someone off of the list, and Judge, which again is a very technologically advanced reference has many passages devoted to this concept of having an intranet, and the users have a list of outside emailers who can email them. I think a lot of us know about that, and the list is made from outgoing email, which Judge describes, and email activity, there are iterations going on here, and internal determinations, and Judge at the bottom of column 26 talks about calculating trust values. That's the same thing as determining a singular, a probability. So the invention is really broad. Your opposing counsel argues that, I mean he doesn't disagree with you on what you're saying Judge shows, that Judge is showing that you send emails out, and that the number of times you send them out and the number of times you get emails back in, and that activity will give you some statistical basis to decide whether or not someone should stay on the whitelist. He's saying that's a totally different indicator than the indicator that is claimed in the application. No it's not, Your Honor, respectfully. Because Judge expressly discloses to people skilled in the art about maintaining the list, and that means keep on or drop off, and this area... But you keep on or drop off based on the activity. Yes, Your Honor, and that's the activity in columns 24 to 25 and 26, where you report the outbound address as trouble. If there are people reporting... Again, that reporting as trouble is just one sentence. That's what you're relying on. There's no other reference to reporting. Everything else is just statistics based on the activity levels back and forth, right? No, Your Honor. The tracking addresses over time in column 26 is again that there's this snapshot being looked at for a particular address. Are people in the group corresponding with this person, say, or having activity? And then when you have that tracking addresses over time, that leads down to, in these columns, we see about building the whitelist, maintaining the whitelist, using the whitelist, and then down at the bottom also calculating trust values. And it's very similar to what applicant does in his specification about calculating a probability and comparing it with a threshold. So the same thing that applicant does is in Judge columns 26, 25, and 24. Again, Claim 1 is a unless the court has any further questions, I'll take my seat. Thank you, Mr. Piccolo. Thank you, Your Honor. Mr. Springer has four minutes for rebuttal. Thank you, Your Honor. Judge O'Malley, two specific issues that you raised or questions that you raised are  that the TCCM specification does provide an example where all the users on the internal side are trusted users that to suggest that limits all the claims in such a way, A, would be an improper limitation of the specification and of the claim, but more importantly, would disregard various other TCCM specifications. For example, as I referenced earlier at page 77 of the appendix, at lines 3 and 4, there's a discussion of trusted users being specific groups or divisions. And then again, on page 82 of the appendix, also at lines 3 and 4, as I referenced earlier, the implementation of policy. So to adopt a construction of trusted users as being all users on the intranet, would A, would be to disregard the component of trust, but B, would be to disregard these other specific embodiments that are disclosed within the specification. So to adopt the construction advocated by the Patent Office would be to have basically an inconsistent interpretation of the claims versus the specification. But more importantly, returning to that trusted peers language in column 6, again, trusted peers of peers in the specification of judge a single time. And that's at column 6. There's no explanation of who these trusted peers are, what they are, what they do. The only thing that makes sense is in the context of column 7 where it talks about the peer-to-peer based messaging notification system. And again, as I explained prior, that's a system on the intranet and that's an actual email system. It's not the individual users inside the intranet. More importantly, regardless of what trusted peers may or may not mean in column 6, there's absolutely no correlation of column 6 lines 49 through 51 to figure 2. As Judge O'Malley correctly noted, figure 1 is actually the prior art and just shows a firewall and an intranet. And then figure 2 shows something similar. In fact, the first reference to figure 2 and what figure 2 may or may not be teaching doesn't appear actually until several columns later on column 12 of the judge reference. And that's on page 45 of the appendix. So I think it would be an error to suggest that the trusted peers reference in column 6 somehow correlates to the disclosure of column 1 and column 2, notwithstanding the fact that SonicWall contends that the trusted peers are actually the email system, not the users. And I think that's clear when you look at column 7, line 19. That issue aside, Judge O'Malley, I believe as you also correctly noted, SonicWall does not dispute. There's any number of whitelisting techniques disclosed in the judge reference. And SonicWall is not attempting to say that they invented whitelisting. What they have invented is an improvement upon whitelisting. That it uses some basic whitelisting techniques but uses a novel and non-obvious extension of that. And among those are the introduction of the trusted users in addition to using that indicia of feedback. And I don't think the Patent Office's interpretation of the outbound in real time meets that limitation. Because the only way you can really have a real time updating is for the email to be going through the firewall. I can't sit there and click yes or no, yes or no, on each individual email and honestly suggest that that is real time. That's, if anything, that's periodic or not real time. So to adopt or to interpret the specification of judges the Patent Office advocates, I think goes against the plain language of the specification but makes even less sense in the general context of the remainder of all those discussions of whitelisting, which yes, they're whitelisting techniques that update the whitelist but they're done automatically by the system. There is no feedback or interaction by the user. And the language of the claim is very clear. Receiving an indicator from the one or more users, the trusted users, on the intranet as to whether the sender of the received message should remain on the whitelist. There is no indication. There is no interaction. So there cannot be a finding that judge in that regard discloses that limitation of the claim. Thank you. Thank you. Mr. Springer, we will be trusted users of both of your arguments. I take the case under advisement. Thank you, Your Honor.